**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Tanya Guzman-Martinez, | ) | No. CV 11-02390-PHX-NVW |
| Plaintiff, | ) ) | **ORDER** |
| vs. | ) ) | |
| Corrections Corporation of America, et al., | ) ) | |
| Defendants. | ) ) ) | |

Before the Court are Defendant City of Eloy's Motion to Dismiss (Doc. 17); Defendants Corrections Corporation of America ("CCA"), Chuck DeRosa, and T. Mohn's Motion to Dismiss (Doc. 26) joined by Defendant Donal Adams (Doc. 38); and Defendants Katrina S. Kane, Earl Scalet, Bo Campbell, and Michael Leal's Motion to Dismiss (Doc. 43).  Oral argument was heard on these motions on July 10, 2012.

Also, Plaintiff was ordered to show cause why Counts II and IV of the Complaint against Defendant Justin Manford should not be dismissed for reasons stated in Defendants CCA, DeRosa, and Mohn's Motion to Dismiss, and Plaintiff filed a response to the order to show cause.  (Doc. 62.)  Defendant Manford filed a Notice Regarding Order to Show Cause in which he requested "equal consideration of all claims brought against him" that were the subject of CCA's motion to dismiss.  (Doc. 60.)  The Court does not construe Manford's notice to be a motion and does not decide whether any claims against Manford should be dismissed.

1    **I.     Legal Standard**

2        On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), all allegations of material

3    fact are assumed to be true and construed in the light most favorable to the nonmoving

4    party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). Dismissal under Rule

5    12(b)(6) can be based on "the lack of a cognizable legal theory" or "the absence of

6    sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police*

7    *Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To avoid dismissal, a complaint must contain

8    "only enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp.*

9    *v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff

10   pleads factual content that allows the court to draw the reasonable inference that the

11   defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

12   (2009).

13       The principle that a court accepts as true all of the allegations in a complaint does

14   not apply to legal conclusions or conclusory factual allegations. *Id.* "Threadbare recitals

15   of the elements of a cause of action, supported by mere conclusory statements, do not

16   suffice." *Id.* "A plaintiff's obligation to provide the grounds of his entitlement to relief

17   requires more than labels and conclusions, and a formulaic recitation of the elements of a

18   cause of action will not do." *Twombly*, 550 U.S. at 555.

19   **II.    Facts Assumed to Be True**

20       The Court assumes the following facts pled by Plaintiff to be true for the purpose

21   of deciding the motions to dismiss.

22       Plaintiff Tanya Guzman-Martinez describes herself as a transgender woman, who

23   was born biologically male, but self-identifies as female.[1]  She has undergone surgical

24   alterations to her breasts, buttocks, hips, and legs to appear more feminine and, at the time

25   she was detained, was taking hormones and estrogen to prepare for gender reassignment

26

27       [1]This Order uses the term "transgender woman" to identify a person who is

28   biologically male and self-identifies as female.

surgery.  She does not claim to be biologically female presently.  In September 2009, Plaintiff was placed in federal immigration removal proceedings and detained from September 29, 2009, until May 14, 2010, at the Eloy Detention Center ("Center") in Eloy, Arizona, operated by the Corrections Corporation of America ("CCA").  She applied for asylum, withholding of removal, and protection under the Convention Against Torture because of past persecution and fear of future persecution in Mexico because of her gender identity.

CCA operates the Center under a contract with the City of Eloy, which has a contract with the United States Immigration and Customs Enforcement ("ICE") to house ICE detainees.  On February 17, 2006, ICE executed an agreement signed by the City of Eloy on February 13, 2006, for the detention and care of ICE detainees.  The agreement requires the City to house detainees in accordance with the most current editions of the ICE Detention Requirements, American Correctional Association Standards for Adult Local Detention Facilities, and National Commission on Correctional Health Care standards.  It provides that ICE inspectors will conduct periodic inspections of the facility to assure compliance with the identified standards.  It also provides that ICE will pay the City $68.45 per day per detainee accepted and housed by the City.  Under the heading "Medical Services," the agreement states:  "The PROVIDER agrees to accept and provide for the secure custody, care, and safekeeping of detainees in accordance with the State, and local laws, standards, policies, procedures, or court orders applicable to the operations of the facility."

An "Agreement Between Eloy, Arizona and Corrections Corporation of America" was executed by the City on February 14, 2006, and CCA on February 17, 2006.  It provides that CCA will provide services in compliance with the terms of the agreement between the City and ICE for every federal inmate accepted into custody at the Center and the City will pay CCA the per diem fee paid to the City pursuant to its agreement with ICE.  In addition, CCA will pay the City an administrative fee of $.25 per day per inmate held at the Center pursuant to the two agreements.  The agreement between the

City and CCA also provides that CCA will indemnify the City and its officers and employees from liability and any claims to the extent they arise as a result of CCA's acts and omissions in the performance of the agreement.

The ICE Detention Standard requires that detainees be screened for potential vulnerabilities upon arrival at a detention facility and that each detainee's classification be reviewed at regular intervals or at any other time when additional relevant information, such as an assault or victimization, becomes known.  The American Correctional Association Standards require that single occupancy cells be available when indicated for inmates likely to be exploited or victimized by others.  The National Commission on Correctional Health Care has declared that custody staff should be aware that transgender people are common targets for violence and should take appropriate safety measures regardless of whether the individual is placed in male or female housing areas.  At no time during her detention at the Center was Plaintiff provided a single-occupancy cell, even after she requested one.

Multiple reports have been published describing problems in the provision of care to immigration detainees.  These reports found that the lack of resources, insufficient standards, and failure to adequately staff and monitor personnel and practices at immigration detention facilities present serious risks to the health, well-being, and legal rights of all detainees, especially for vulnerable populations and transgender women detainees.

Throughout her detention at the Center, Plaintiff was housed in a male special housing unit (*i.e.*, administrative segregation) where she was in daily, direct contact with male detainees and detention officers.  She was subjected to repeated verbal abuse and harassment by male detainees and male detention officers.  She was threatened with disciplinary action.  Plaintiff often was patted-down by male detention officers, but after complaining to the Center staff, she was told she would no longer be subjected to pat-downs by male detention staff.

On December 7, 2009, Defendant Justin Manford, a detention officer at the Center employed by CCA, forced Plaintiff to watch him masturbate into a styrofoam cup and then demanded that she ingest his ejaculated semen.  Manford threatened that he could have Plaintiff locked up in "the hole," lengthen her detention, or have her deported to Mexico if she did not comply with his demands.  The incident followed a history of Manford questioning Plaintiff regarding her sexuality, whether she had a boyfriend, and whether other inmates had seen her breasts.  Plaintiff immediately reported the incident to CCA detention staff, ICE, and the Eloy Police Department.  On June 8, 2010, Manford was convicted in the Pinal County Superior Court for Attempted Unlawful Sexual Contact in violation of A.R.S. § 13-1419(A)(2).

On April 23, 2010, a male detainee, Johnny Pereira Vigil pushed Plaintiff, forcefully grabbed her breast, and slapped her on her buttocks.  When Plaintiff told Vigil to stop, Vigil threatened that he or other detainees would physically hurt her.  This incident followed a period of Vigil harassing Plaintiff by calling her a "faggot," making sexual gestures, following her in and out of her cell, and peeking into her cell when Plaintiff was using the toilet or dressing.  Immediately after the incident, Plaintiff reported it to CCA detention staff.  She did not file an incident report with the local police until May 4, 2010, because she feared retaliation by other detainees and because CCA and other Defendants had failed to safeguard her from attacks by male detainees and guards.  On May 14, 2010, Plaintiff was released from ICE custody.

After the incidents, Plaintiff experienced severe depression and anxiety and required medication for anxiety and as a sleep aid.  She has experienced episodes of hyper-vigilance from fear of being retaliated against by officers or detainees.  Since her release from custody, Plaintiff continues to suffer from depression, anxiety, and fear of contact with law enforcement.  It is possible that Plaintiff could be detained by ICE/CCA in the future because withholding of removal does not permit adjustment status to legal permanent resident or naturalization to U.S. citizen.

Defendant Chuck DeRosa was an employee of CCA and the Center's warden, responsible for setting its operational policies and implementing and approving its practices for housing transgender detainees.  Defendant T. Mohn was the unit manager at the Center and responsible for determining Plaintiff's classification status.  Defendant Donal Adams was a detention officer at the Center and responsible for overseeing decisions about Plaintiff's housing and classification status.

Defendant Katrina Kane was the ICE Field Office Director in Phoenix, which includes the Center.  Defendant Earl Scalet was the ICE Assistant Field Office Director at the Center.  Defendant Bo Campbell was the ICE Supervisory Detention and Deportation Officer at the Center.  Defendant Michael Leal was the ICE Deportation Officer responsible for matters relating to Plaintiff's detention and removal proceedings including issues regarding her custody and classification.

On December 5, 2011, Plaintiff initiated this lawsuit.  The Complaint alleges the following claims:

Count I:   Deprivation of Constitutional Rights Under Fifth & Fourteenth Amendments–Due Process (42 U.S.C. § 1983) (Against Eloy, CCA, DeRosa, Mohn, Adams)

Count II:   Deprivation of Constitutional Rights Under Fifth & Fourteenth Amendments–Due Process (42 U.S.C. § 1983) (Against Manford, Eloy, CCA, DeRosa, Mohn, Adams)

Count III:   Deprivation of Constitutional Rights Under the Fifth Amendment–Due Process (*Bivens*) (Against Kane, Scalet, Campbell, Leal)

Count IV:   Cruel, Inhuman, and Degrading Treatment in Violation of 28 U.S.C. § 1350 (Against Manford and CCA)

Count V:   Battery (Against Manford and CCA)

Count VII:[2]   Intentional Infliction of Emotional Distress (Against Manford and CCA)

Count VIII:   Negligent Supervision (Against CCA and DeRosa)

_____

[2]The Complaint does not include a Count VI.

The Complaint seeks money damages, punitive damages, and declaratory judgment that "the policies and practices concerning the housing and treatment of transgendered detainees in [the Center] is inadequate, and unlawfully and unreasonably exposes detainees to harm." Each of the named Defendants except Manford has filed a motion to dismiss.

## III.   Analysis

### A.   Claim Against Federal Defendants Katrina S. Kane, Earl Scalet, Bo Campbell, and Michael Leal

Count III is the only claim pled against ICE employees Kane, Scalet, Campbell, and Leal. The Complaint identifies Count III as a claim under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 395-96 (1971), which held that money damages may be obtained for injuries resulting from a violation of the Fourth Amendment by federal officials. "The basis of a *Bivens* action is some illegal or inappropriate conduct on the part of a federal official or agent that violates a clearly established constitutional right." *Balser v. Department of Justice, Office of the United States Trustee*, 327 F.3d 903, 909 (9th Cir. 2003). Because Count III is expressly identified as a *Bivens* claim and the Complaint's general prayer for relief seeking declaratory judgment does not refer to Kane, Scalet, Campbell, and Leal, the Complaint is construed as seeking only money damages against these defendants.

Count III alleges that Kane, Scalet, Campbell, and Leal "exhibited deliberate indifference in their respective capacities by (1) willfully disregarding the necessity of policies and measures to prevent assault, sexual assault, and abuse of transgender detainees under ICE custody in the [Center]; and (2) by failing to appropriately monitor and supervise housing and detention conditions which they knew were proceeding in violation of applicable contracts, policies, and standards designed to prevent assault, sexual assault, and abuse of transgender detainees, including Ms. Guzman-Martinez." The Complaint does not explicitly allege, even in general terms, what policies and measures were not, but should have been, adopted by ICE to prevent assault, sexual

1   assault, and abuse of transgender detainees under ICE custody in the Center.  Nor does

2   the Complaint explicitly allege what housing and detention conditions violated applicable

3   contracts, policies, and standards.  It alleges that Campbell and Leal failed to conduct an

4   adequate risk assessment about the placement and classification of Plaintiff at the Center

5   and to properly and safely house her while at the Center, but it does not allege how

6   Plaintiff should have been classified and housed.  It also alleges that Kane, Scalet, and

7   Campbell failed to institute appropriate education and training and to adopt procedures

8   that would have protected Plaintiff from "verbal assaults and repeated sexual attacks."

9        The Complaint implies that these and other Defendants should have adopted and

10  implemented a policy that transgender women not be housed with male inmates and not

11  have contact with male detention officers, but the Complaint does not allege that they

12  should have adopted and implemented a policy that transgender women be housed with

13  female inmates and only have contact with female detention officers.  Nor does it allege

14  that transgender women should be housed only with other transgender women or isolated

15  from all other inmates regardless of gender or gender identity.  The Complaint refers to a

16  need for housing transgender people in single-occupancy cells, but does not allege that

17  housing transgender women in single-occupancy cells within facilities for male inmates

18  that are monitored by male detention officers would prevent or reduce the risk of assault,

19  sexual assault, and abuse of transgender detainees under ICE custody in the Center.

20  Although the Complaint alleges that Defendants did not follow ICE standards for

21  classifying and reclassifying Plaintiff based on her vulnerabilities, the Complaint does not

22  allege what her improper classification was, how she should have been classified or

23  reclassified under ICE standards, or how proper classification would have prevented or

24  reduced the risk of assault, sexual assault, and abuse.

25        At oral argument, however, Plaintiff's counsel stated that, at a minimum, Plaintiff

26  should have not been housed with male detainees and should not have had contact with

27  male detention officers.  Plaintiff's counsel further stated that Plaintiff should have been

28  housed with female detainees or housed separately.  Plaintiff does not contend that any

1   Defendants were aware of any particular threat to her specifically before the December 7,

2   2009 incident with Manford.  She contends only that Defendants had general awareness

3   of a potential risk imposed by housing a detainee with a feminine appearance among male

4   detainees and in contact with male detention officers.  Plaintiff has not offered any

5   authority for the proposition that transgender women generally have a constitutional right

6   either to be housed with female detainees and in contact only with female detention

7   officers or to be housed away from all other detainees and in contact only with female

8   detention officers.

9                              **1.      Qualified Immunity Standard**

10          Kane, Scalet, Campbell, and Leal contend that qualified immunity bars Count III.

11  "Qualified immunity shields federal and state officials from money damages unless a

12  plaintiff pleads facts showing (1) that the official violated a statutory or constitutional

13  right, and (2) that the right was 'clearly established' at the time of the challenged

14  conduct." *Ashcroft v. al-Kidd*, __ U.S. __, 131 S. Ct. 2074, 2080 (2011).  Courts have

15  discretion to decide which of the two prongs of the qualified immunity analysis should be

16  addressed first and may grant qualified immunity on the basis of the second prong alone

17  without deciding the first prong.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *James*

18  *v. Rowlands*, 606 F.3d 646, 651 (9th Cir. 2010).

19          "A Government official's conduct violates clearly established law when, at the

20  time of the challenged conduct, the contours of a right are sufficiently clear that every

21  reasonable official would have understood that what he is doing violates that right."

22  *Ashcroft v. al-Kidd*, 131 S. Ct. at 2083 (internal quotation and alteration marks omitted).

23  For a right to be "clearly established," there need not be a case directly on point, but

24  "existing precedent must have placed the statutory or constitutional question beyond

25  debate."  *Id.*  "The principles of qualified immunity shield an officer from personal

26  liability when an officer reasonably believes that his or her conduct complies with the

27  law."  *Pearson*, 555 U.S. at 244.

28

## 2.    Fourteenth Amendment Due Process Standard

Plaintiff contends her constitutional rights as a civil detainee to be free from harassment, sexual assault, and serious physical and emotional harms were clearly established.  Although the Count III of the Complaint alleges Kane, Scalet, Campbell, and Leal exhibited "deliberate indifference," Plaintiff contends a lesser standard applies.

The Eighth Amendment's prohibition of cruel and unusual punishment requires prison officials to provide humane conditions of confinement, ensure that inmates receive adequate food, clothing, shelter, sanitation, and medical care, and take reasonable measures to guarantee the safety of the inmates.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985) (Eighth Amendment provides inmates with a right to safe conditions of confinement, including an adequate level of personal security).  To be liable under the Eighth Amendment, a prison official must act with deliberate indifference to an inmate's health or safety.  *Farmer*, 511 U.S. at 834.

In contrast, the Fourteenth Amendment Due Process Clause protects a non-convicted detainee from punishment prior to an adjudication of guilt in accordance with due process of law.  *Bell v. Wolfish*, 441 U.S. 520, 534-35 (1979).  "This standard differs significantly from the standard relevant to convicted prisoners, who may be subject to punishment so long as it does not violate the Eighth Amendment's bar against cruel and unusual punishment."  *Pierce v. County of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008).  The "more protective" Fourteenth Amendment standard applies to conditions of confinement for detainees who have not been convicted and requires the government to do more than provide minimal necessities.  *Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir. 2004).  Thus, to prevail on a Fourteenth Amendment claim regarding conditions of confinement, a non-convicted detainee generally need not satisfy the Eighth Amendment's "deliberate indifference" standard of culpability.  *Id.* at 933-34.  However, a detainee's desire to be free from discomfort does not rise to the level of a fundamental liberty interest under the Fourteenth Amendment.  *Bell*, 441 U.S. at 537.

1    To evaluate the constitutionality of pretrial detention conditions that are not

2    alleged to violate any express constitutional guarantee, a district court must determine

3    whether those conditions amount to punishment of the detainee.  *Bell*, 441 U.S. at 535;

4    *Pierce*, 526 F.3d at 1205; *Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004).  "For a

5    particular governmental action to constitute punishment, (1) that action must cause the

6    detainee to suffer some harm or 'disability,' and (2) the purpose of the governmental

7    action must be to punish the detainee."  *Pierce*, 526 F.3d at 1205 (quoting *Bell*, 441 U.S.

8    at 538).  To constitute punishment, the governmental action must cause harm or disability

9    that either significantly exceeds or is independent of the inherent discomforts of

10   confinement, but it does not need to cause a harm independently cognizable as a separate

11   constitutional violation, *e.g.*, deprivation of First Amendment rights.  *Demery*, 378 F.3d at

12   1030.  To determine whether an action's purpose is punitive, in the absence of evidence

13   of express intent, a court may infer that the purpose of a particular restriction or condition

14   is punishment if the restriction or condition is not reasonably related to a legitimate

15   governmental objective or is excessive in relation to the legitimate governmental

16   objective.  *Pierce*, 526 F.3d at 1205 (citing *Bell*, 441 U.S. at 539); *Demery*, 378 F.3d at

17   1028 (citing *Bell*, 441 at 538).

18   Legitimate governmental objectives that may justify adverse detention conditions

19   include maintaining security and order and operating the detention facility in a

20   manageable fashion.  *Pierce*, 526 F.3d at 1205.  "[M]aintaining institutional security and

21   preserving internal order and discipline are essential goals that  may require limitation or

22   retraction of the retained constitutional rights of both convicted prisoners and pretrial

23   detainees."  *Bell*, 441 U.S. at 546.  Retribution and deterrence are not legitimate

24   governmental objectives.  *Demery*, 378 F.3d at 1030-31.

25   To determine whether detention restrictions or conditions are reasonably related to

26   maintaining security and order and operating the institution in a manageable fashion,

27   courts ordinarily should defer to the expert judgment of correction officials in the absence

28   of substantial evidence that indicates officials have exaggerated their response to these

considerations. *Bell*, 441 U.S. 540 n.23. A reasonable relationship between the governmental objective and the challenged condition does not require an "exact fit," a showing that it is the "least restrictive alternative," or proof that the policy does in fact advance the legitimate governmental objective. *Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002). But it does require evidence that the correction officials' judgment was rational, *i.e.*, they might have reasonably thought that the policy would advance a legitimate governmental objective. *Id.*

Therefore, a condition of confinement for an inmate who has not been convicted violates the Fourteenth Amendment if it:

(1)     imposes some harm to the detainee that significantly exceeds or is
         independent of the inherent discomforts of confinement *and*

(2)     (a) is not reasonably related to a legitimate governmental objective *or*
         (b) is excessive in relation to the legitimate governmental objective.

However, the Fourteenth Amendment extends only limited rights to detained aliens. *See Papa v. United States*, 281 F.3d 1004, 1010 (9th Cir. 2002). As a detained alien, Plaintiff has a constitutional right that officials not consciously disregard or act with deliberate indifference toward her safety by knowingly placing her in harm's way. *Id.* (citing *Lynch v. Cannatella*, 810 F.2d 1363, 1375 (5th Cir. 1987) ("[E]ven an excludable alien may not be denied the fundamental liberty interest to be free of gross physical abuse in the absence of some articulable, rational public interest that may be advanced by such conduct.")).

**3.     Constitutional Standard for Classifying and Housing Transgender Women Not Clearly Established**

Without considering any limitation of Plaintiff's rights under the Fourteenth Amendment because she is a detained alien, housing transgender women inmates among male inmates monitored by male detention officers would violate the Fourteenth Amendment if the practice imposes some harm to the transgender women inmates that significantly exceeds the inherent discomforts of confinement and is not reasonably

1  related to a legitimate governmental objective, such as maintaining security and order and

2  operating the detention facility in a manageable fashion.  To determine whether Kane,

3  Scalet, Campbell, and Leal are shielded by qualified immunity, it is not necessary to

4  decide the first prong of the qualified immunity standard, *i.e.*, whether the practice

5  violates the Fourteenth Amendment, because the constitutional standard is not clearly

6  established, which satisfies the second prong for establishing qualified immunity.

7          Although the Complaint alleges generally that certain Defendants failed to comply

8  with various contracts, regulations, and guidelines, it does not assert what the

9  constitutional standard is for housing detainees who are transgender women.  Plaintiff

10  primarily alleges that Defendants should have known that transgender women inmates are

11  vulnerable to victimization and that housing them with male inmates monitored by male

12  detention officers would subject them to serious risk of substantial harm.  Plaintiff also

13  alleges inadequate training and supervision of detention officers and supervision of

14  inmates, but does not allege, even generally, the training and supervision needed to

15  prevent serious risk of substantial harm to transgender women.

16          There is no consensus regarding the classification, housing, training, and

17  supervision policies and practices that best protect transgender women detainees, much

18  less what is constitutionally required.  Most immigration detainees are housed according

19  to their external genitalia.  Laurel Anderson, *Punishing the Innocent:  How the*

20  *Classification of Male-to-Female Transgender Individuals in Immigration Detention*

21  *Constitutes Illegal Punishment Under the Fifth Amendment*, 25 Berkeley J. Gender, L. &

22  Just., Spr. 2010, at *1.  Some commentators argue that a detainee's sex should not be

23  classified based on the presence of particular genitalia because doing so increases the risk

24  of violence and emotional harm to the detainees.  *Id.* at *8.  These commentators also

25  contend that the most common solution, administrative segregation, does not always

26  provide more protection than placement in the general population and may amount to

27  torture.  *Id.* at *8-10.  Some propose that ICE automatically release transgender

28  immigrants if they do not pose a threat to society on the basis that they have a credible

1    fear of persecution in detention and that ICE use electronic monitoring or enrollment in

2    community or faith-based programs to ensure that detainees are present at removal

3    hearings.  *Id.* at *12.  One commentator contends, "As long as placement in detention is

4    sex-segregated by genitalia or birth-assigned sex and the only alternative is administrative

5    segregation, any placement for transgender detainees in detention is dangerous and

6    detrimental."  *Id.* at *13.  The commentator further argues that, if not released,

7    transgender women detainees should be classified as female for housing and other

8    purposes, but concedes that restructuring the gender classification system of detention

9    centers likely would be complicated and difficult.  *Id.* at *14; *see also* Gabriel Arkles,

10   *Safety and Solidarity Across Gender Lines:  Rethinking Segregation of Transgender*

11   *People in Detention*, 18 Temp. Pol. & Civ. Rts. L. Rev. 515, Spr. 2009; *Medina-Tejada v.*

12   *Sacramento County*, No. Civ.S-04-138FDC/DAD, 2006 WL 463158 (E.D. Cal. Feb. 27,

13   2006) (jail classification was presumed punitive where a pre-deportation detainee

14   transgender woman was isolated and received restricted dayroom and recreation time as a

15   result of the classification).

16          Plaintiff has not identified any legal authority holding that a transgender woman,

17   who is biologically male, has a constitutional right to be housed in an immigration

18   detention facility for females and to only have contact with female detention officers.

19   Even if such a constitutional right existed, housing detainees who are biologically male

20   but have a feminine appearance with female detainees surely would infringe upon

21   constitutional rights of the female detainees and impermissibly burden operation of

22   detention facilities.  And keeping a transgender woman isolated from all other detainees,

23   but having contact only with female detention officers, would not only burden operations,

24   but might constitute unconstitutional punishment.

25          Therefore, Plaintiff does not have a clearly established constitutional right to be

26   housed in a women's detention facility or in a single-occupancy cell in a men's detention

27   facility or to be released from detention based solely on her status as a transgender

28

1   woman.  Count III against Kane, Scalet, Campbell, and Leal is barred by qualified

2   immunity.

3        **B.**    **City of Eloy**

4        Counts I and II are the only claims pled against the City.  Both are titled as

5   "Deprivation of Constitutional Rights Under Fifth & Fourteenth Amendments—Due

6   Process (42 U.S.C. § 1983)."  Count I alleges that the City maintained or sanctioned

7   official policies and practices of "deliberately or indifferently neglecting to protect

8   transgender immigrant detainees at [the Center] from clear and foreseeable risk of assault,

9   sexual assault, and abuse by detainees and guards" by failing to implement policies and

10  practices to prevent assault, sexual assault, and abuse and by failing to appropriately

11  monitor and supervise detention conditions.  In other words, the City allegedly sanctioned

12  official policies and practices of lack of protection by failing to implement protective

13  policies and practices.  Count I further alleges that the City's deliberate indifference to the

14  clear risk of sexual assault on Plaintiff caused her to suffer injury.  Count II alleges, in

15  essence, that the City's deliberate indifference to the need to modify policies and

16  practices at the Center caused Manford's deprivation of Plaintiff's liberty without due

17  process of law.  Thus, Counts I and II overlap, but are not identical.

18       **1.**    **Under Color of State Law**

19       "To state a claim under § 1983, a plaintiff must allege the violation of a right

20  secured by the Constitution and laws of the United States, and must show that the alleged

21  deprivation was committed by a person acting under color of state law." *West v. Atkins*,

22  487 U.S. 42, 48 (1988).  "The traditional definition of acting under color of state law

23  requires that the defendant in a § 1983 action have exercised power possessed by virtue of

24  state law and made possible only because the wrongdoer is clothed with the authority of

25  state law." *Id.* (internal quotation marks and citations omitted).

26       To constitute state action, the deprivation must be caused by the exercise of
     some right or privilege created by the State or by a person for whom the

27       State is responsible, and the party charged with the deprivation must be a
     person who may fairly be said to be a state actor.  State employment is

28       generally sufficient to render the defendant a state actor.  It is firmly

> established that a defendant in a § 1983 suit acts under color of state law
> when he abuses the position given to him by the State. Thus, generally, a
> public employee acts under color of state law while acting in his official
> capacity or while exercising his responsibilities pursuant to state law.

*Id.* at 49-50 (internal quotation marks, omissions, and citations omitted).

The City contends that Plaintiff's claims against the City fail because the alleged deprivations of Plaintiff's constitutional right were not committed by a person acting under color of state law. Although a municipality generally is considered a state actor, the City contends it did not exercise responsibilities pursuant to state law, but rather merely conveyed federal responsibilities for housing immigration detainees to CCA. *See Pollard v. The GEO Group, Inc.*, 629 F.3d 843, 854 (9th Cir. 2010) (employees of private corporation operating a prison under contract with the federal government acted under color of federal law), *reversed on other grounds by Minneci v. Pollard*, __ U.S. __, 132 S. Ct. 617 (2012). But the City has not provided any authority for the proposition that acting under federal authority somehow eliminates its character as a state actor.

## 2. No Constitutional Violation by the City

"To bring a § 1983 claim against a local government entity, a plaintiff must plead that a municipality's policy or custom caused a violation of the plaintiff's constitutional rights." *Ass'n for Los Angeles Deputy Sheriffs v. Cnty. of Los Angeles*, 648 F.3d 986, 992-93 (9th Cir. 2011). A plaintiff must show (1) he possessed a constitutional right of which he was deprived, (2) the municipality had a policy, (3) the policy amounts to deliberate indifference to the plaintiff's constitutional right, and (4) the policy is the "moving force behind the constitutional violation." *Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006). "For a policy to be the moving force behind the deprivation of a constitutional right, the identified deficiency in the policy must be closely related to the ultimate injury," and the plaintiff must establish "that the injury would have been avoided had proper policies been implemented." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1190 (9th Cir. 2006).

1    Plaintiff does not allege any specific custom or policy of the City that allegedly

2  amounted to deliberate indifference to Plaintiff's constitutional rights.  Plaintiff does not

3  allege that the City was deliberately indifferent by delegating its responsibility to CCA

4  generally or by failing to impose certain requirements on CCA.  The Complaint alleges

5  only that the City maintained policies, practices, and/or customs of failing to prevent

6  assault, sexual assault, and abuse and failing to appropriate monitor and supervise

7  detention conditions.

8    Further, the City's custom or policy of failing to implement unspecified policies

9  and practices is not closely related to the ultimate injury, notwithstanding the Complaint's

10 conclusory allegations of direct and proximate causation.  The Court does not assume as

11 true the Complaint's legal conclusions and conclusory factual allegations that the City's

12 failure to adopt and implement unspecified policies directly and proximately caused

13 Plaintiff's injuries.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The agreement

14 between ICE and the City requires the City to house immigration detainees in accordance

15 with certain standards, which Plaintiff does not allege require the City to house

16 transgender women in single-occupancy cells or women's facilities or to keep them away

17 from contact with male detention officers.  At most, the Complaint alleges that NCCHC

18 recommends that custody staff be aware that transgender people are common targets for

19 violence and appropriate safety measures should be taken and that the ACA Standards

20 provide that single-occupancy cells should be available for inmates likely to be exploited

21 or victimized.  The Complaint does not allege that if custody staff had been provided

22 awareness training or if Plaintiff had been provided a single-occupancy cell, neither

23 detention officer Manford nor detainee Vigil would have subjected Plaintiff to the

24 December 7, 2009 and April 23, 2010 incidents from which Plaintiff's claims of

25 deprivation of constitutional rights arise.  Causation is even more attenuated because even

26 if the City were to adopt certain unidentified policies, they could only be implemented by

27 CCA.  Thus, the City's failure to adopt policies regarding housing and protecting

28 transgender women immigration detainees is not the "moving force" behind the

December 7, 2009 and April 23, 2010 incidents from which Plaintiff's claims of deprivation of constitutional rights arise.

Therefore, Counts I and II fail to state a claim upon which relief can be granted against the City.

**C.     Corrections Corporation of America, Chuck DeRosa, T. Mohn, and Donal Adams**

**1.     Counts I and II (§ 1983)**

As found above, Counts I and II do not allege that any particular policy or practice regarding housing or monitoring immigration detainees violated Plaintiff's constitutional rights.  They do not allege that CCA, DeRosa, Mohn, or Adams could have prevented Plaintiff's alleged abuse by implementing different policies, practices, or procedures. Although the Complaint implies that Plaintiff's injuries resulted from being housed with male detainees and having contact with male detention officers, it does not explicitly allege that she has a constitutional right to be housed with female detainees and to have contact only with female detention officers.  Thus, Counts I and II fail to state a claim against CCA, DeRosa, Mohn, and Adams upon which relief can be granted.

CCA, DeRosa, Mohn, and Adams contend that Counts I and II brought under § 1983 fail to state a claim upon which relief can be granted also because they did not act under color of state law when exercising their contractual responsibilities related to housing and monitoring federal immigration detainees at the Center.  If CCA had contracted directly with ICE, these Defendants likely would not be considered state actors, *see Pollard*, 629 F.3d at 854, but CCA's contract is with the City.  Under the present circumstances, it is not necessary to decide whether CCA, DeRosa, Mohn, or Adams acted under color of state law, federal law, or both.

**2.     Count IV (§ 1350) (Alien Tort Claim Act)**

Count IV alleges that CCA is liable to Plaintiff for cruel, inhuman, and degrading treatment in violation of 28 U.S.C. § 1350 vicariously as Manford's employer and directly by (a) willfully disregarding the need to implement policies and measures to

1   prevent abuse of transgender detainees and (b) "failing to supervise and monitor detention

2   conditions which it knew violated applicable policies and standards designed to prevent

3   assault, sexual assault, and abuse of [Plaintiff] and other transgender detainees."  Plaintiff

4   alleges she was subjected to cruel, inhuman, and degrading conditions of confinement by

5   CCA during the December 7, 2009 and April 23, 2010 incidents, by verbal abuse and

6   harassment by male detainees and male detention officers on other occasions, and by

7   being patted down by male detention officers, which she contends is actionable under

8   § 1350.  But the allegation that the alleged mistreatment is "cruel, inhuman, and

9   degrading" is a legal conclusion that is not assumed to be true in deciding a motion to

10  dismiss.  Further, Plaintiff does not allege what policies CCA should have adopted to

11  prevent the alleged abuse or what conditions it knew violated applicable policies and

12  standards designed to prevent the alleged abuse.

13      Section 1350 provides district courts with jurisdiction over "any civil action by an

14  alien for a tort only, committed in violation of the law of the nations or a treaty of the

15  United States."[3]  As used in § 1350, "the law of the nations" is synonymous with

16  "customary international law" and refers to "a norm that is specific, universal, and

17  obligatory."  *Abagninin v. AMVAC Chemical Corp.*, 545 F.3d 733, 738 (9th Cir. 2008).

18  "Violations of customary international law" are "violations that all countries are deemed

19  to have a legal obligation to take appropriate action against."  *Flomo v. Firestone Natural*

20  *Rubber Co.*, 643 F.3d 1013, 1019 (7th Cir. 2011).

21      When enacted, § 1350 did not create a statutory cause of action for aliens, but

22  "enabled federal courts to hear claims in a very limited category defined by the law of

23  nations and recognized at common law."  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712

24  (2004).  The statute likely was originally intended to address only violations of safe

25  conducts, infringement of ambassadors' rights, and piracy—a "narrow set of violations of

26  the law of nations, admitting of a judicial remedy and at the same time threatening serious

27

28      [3]Plaintiff does not contend that CCA has violated a treaty of the United States.

1  consequences in international affairs." *Id.* at 715.  Courts are directed to exercise restraint

2  in their discretion to consider new causes of action beyond the original three

3  contemplated under § 1350. *Id.* at 725.  "[C]ourts should require any claim based on

4  present-day law of nations to rest on a norm of international character accepted by the

5  civilized world and defined with a specificity comparable to the features of the 18th-

6  century paradigms we have recognized." *Id.*  Under § 1350, "federal courts should not

7  recognize private claims under federal common law for violations of any international

8  law norm with less definite content and acceptance among civilized nations than the

9  historical paradigms familiar when § 1350 was enacted." *Id.* at 732.  "Actionable

10 violations of international law must be of a norm that is specific, universal, and

11 obligatory." *Id.* (quoting *In re Estate of Marcos Human Rights Litigation*, 25 F.3d 1467,

12 1475 (9th Cir. 1994)).  "And the determination whether a norm is sufficiently definite to

13 support a cause of action should (and, indeed, inevitably must) involve an element of

14 judgment about the practical consequences of making that cause available to litigants in

15 the federal courts." *Id.* at 732-33.

16         Although sexual abuse in general may be universally condemned as cruel, the

17 sexual abuse alleged here is not actionable under § 1350 because the specific conduct

18 does not meet an internationally accepted definition of sexual abuse and does not threaten

19 serious consequences in international affairs.  In *Jama v. United States Immigration &*

20 *Naturalization Serv.*, 22 F. Supp. 2d 353, 359 (D.N.J. 1998), the alleged sexual abuse

21 included inappropriate touching of both male and female plaintiffs, seeking sexual favors

22 from female plaintiffs, and refusing female plaintiffs the use of telephones to contact their

23 lawyers unless they submitted to sexual assaults.  However, the district court did not base

24 its finding that the alleged mistreatment violated customary international law on the

25 allegations of sexual abuse alone.  Rather, it concluded that customary international law

26 was violated by the totality of the treatment to which plaintiffs were subjected, which it

27 described as: "Every moment of plaintiffs' detention was filled with abuse." *Id.* at 358.

28 The *Jama* plaintiffs were deprived of sleep by bright lights 24 hours a day and guards

taunting them to stay awake.  They were packed into crowded, filthy dormitories and forced to eat meals inches away from bathroom areas.  They were beaten, shamed, and deprived of clothing and personal hygiene necessities.  They were served spoiled food and insufficient amounts.  Guards regularly locked plaintiffs in solitary confinement cells without warning, explanation, or hearing, for several days to several months.  Guards often shackled plaintiffs to their beds.  Guards performed strip searches and body cavity searches in a manner designed to degrade and humiliate plaintiffs.  In searching male plaintiffs' genital areas, the guards forcefully yanked plaintiffs' genitals causing severe pain.  *Id.* at 358-59.  Such circumstances are not alleged here.

> Moreover, the law of nations, particularly the subset of that law enforceable under [§ 1350], does not include a norm simply because the norm is enshrined in the domestic law of all civilized societies.  Auto theft is not a violation of international law.  As the Supreme Court said in *Sosa*, the drafters of [§ 1350] probably had in mind only rules of international law regulating the conduct of individuals that overlapped with the norms of state relationships, that is, a narrow set of violations of the law of nations admitting of a judicial remedy and at the same time threatening serious consequences in international affairs.  The Court's requirement that the law-of-nations norm be defined with precision is not a substitute for the requirement that the violation be of a type that can substantially impact international affairs, but is an additional requirement.

*Cisneros v. Aragon*, 485 F.3d 1226, 1231 (10th Cir. 2007) (internal quotation marks and citations omitted).  The mistreatment Plaintiff alleges does not threaten serious consequences in international affairs.  There is no basis for concluding that the alleged mistreatment Plaintiff has received violates a "norm of international character accepted by the civilized world" "that is specific, universal, and obligatory."

Moreover, Plaintiff has not alleged a basis for finding CCA vicariously liable under § 1350 for Manford's allegedly tortious actions on December 7, 2009, or for failing to supervise and monitor detention conditions.  *See Flomo*, 643 F.3d at 1020-21 (corporate liability for violations of customary international law is limited to cases in which the violations are directed, encouraged, or condoned at the corporate defendant's decisionmaking level).

1

### 3.   State Law Claims

2          The Complaint alleges three counts against CCA for battery, intentional infliction

3    of emotional distress, and negligent supervision.  The negligent supervision claim is

4    alleged also against DeRosa.  The motions seek dismissal of Count V (Battery) and do not

5    address Counts VII (Intentional Infliction of Emotional Distress) or VIII (Negligent

6    Supervision).

7          "Threadbare recitals of the elements of a cause of action, supported by mere

8    conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

9    Moreover, legal conclusions and conclusory factual allegations are not assumed to be true

10   for the purpose of a motion to dismiss.  *Id.*  Count V of the Complaint states:

11             113.   Defendant Manford intentionally caused harmful and/or
             offensive contact with Ms. Guzman-Martinez.
12
             114.   When Defendant Manford caused harmful and/or offensive
13           contact with Ms. Guzman-Martinez, he was acting with actual or apparent
             authority as an agent of Defendant CCA.
14
             115.   When Defendant Manford caused harmful and/or offensive
15           contact with Ms. Guzman-Martinez, he was acting in the course and scope
             of his employment with CCA.
16
             116.   As a result of Defendant Manford's harmful and offensive
17           contact with Ms. Guzman-Martinez, Ms. Guzman-Martinez has sustained
             injury and damages.
18
     First, Count V does not allege that *CCA* intentionally caused a harmful or offensive
19
     contact with Plaintiff to occur, which is required to establish the tort of battery under
20
     Arizona law.  *See Johnson v. Pankratz*, 196 Ariz. 621, 623, 2 P.3d 1266, 1268 (Ct. App.
21
     2000).
22
           Second, the allegations that Manford acted with actual or apparent authority as an
23
     agent of CCA and that he acted within the course and scope of his employment with CCA
24
     are bare legal conclusions, which are not supported by factual allegations.  Under Arizona
25
     law, whether an employee acted within the course and scope of his employment is
26
     determined by "whether at the time the injury occurred the employee was performing a
27
     service in furtherance of his employer's business."  *Higgins v. Assmann Electronics, Inc.*,
28

217 Ariz. 289, 297, 173 P.3d 453, 461 (Ct. App. 2007) (quoting *Ortiz v. Clinton*, 187 Ariz. 294, 299, 928 P.2d 718, 723 (Ct. App. 1996)).  "[A]n employee is acting within the scope of his employment while he is doing any reasonable thing which his employment expressly or impliedly authorizes him to do or which may reasonably be said to have been contemplated by that employment as necessarily or probably incidental to the employment."  *Ray Korte Chevrolet v. Simmons*, 117 Ariz. 202, 207, 571 P.2d 699, 704 (Ct. App. 1977).  Factors to be considered in determining whether an employee acted within the course and scope of his employment are:

> (a) whether the act is one commonly done by such servants; (b) the time, place, and purpose of the act; (c) the previous relations between the master and servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; (f) whether the master has reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent or departure from the normal method of accomplishing an authorized result; and (j) whether the act is seriously criminal.

*Higgins*, 217 Ariz. at 297, 173 P.3d at 461 (citing *State v. Schallock*, 189 Ariz. 250, 257, 941 P.2d 1275, 1282 (1997), and Restatement (Second) of Agency § 229(1) (1957)).

In *Smith v. Am. Express Travel Related Serv. Co.*, the Arizona Court of Appeals held that a manager's alleged conduct in sexually assaulting and harassing an employee, whom he did not directly supervise, was outside the course and scope of the manager's employment because his conduct "was neither the kind of activity for which he was hired nor was it actuated, even in part, by a desire to serve [the employer]."  179 Ariz. 131, 135, 876 P.2d 1166, 1170 (Ct. App. 1994).  The court found that the manager's alleged actions did not perform a service in furtherance of the employer's business and were committed solely to further his own personal interests.  *Id.* at 136, 876 P.2d at 1171.  Further, no evidence existed from which a reasonable juror could conclude that the employer knew or should have known that the manager had created a sexually offensive working environment and thus was capable of sexual assault.  *Id.* at 137, 876 P.2d at 1172.  During the year and a half of alleged harassment and assault, the plaintiff did not report it, even

1   though she was familiar with the employer's sexual harassment policy and grievance

2   procedures.  When another employee reported that he thought that the manager had

3   sexually harassed and assaulted the plaintiff, the employer immediately began an

4   investigation, placed the manager on an indefinite suspension, and two weeks later

5   terminated the manager's employment.  *Id.*

6       In *Schallock*, the Arizona Supreme Court disapproved of *Smith* to the extent that

7   its language is interpreted as meaning that an employer is never vicariously liable for an

8   intentional tort.  189 Ariz. at 256, 941 P.2d at 1281.  It also found that *Smith* did not apply

9   because the circumstances in *Schallock* were "much different" than those in *Smith* where

10  the evidence did not establish the employer's actual or constructive knowledge of the

11  supervisor's conduct.  *Id.*  In *Schallock*, the evidence on summary judgment showed:

12      [The employer] was aware for close to a decade that [its executive director]
        was engaged in egregious improprieties and did little or nothing to call a
13      halt.  A jury might well choose not to believe claims that these acts were
        unauthorized and outside the course of employment when the employer
14      permitted them to occur and recur over a long period at its place of business
        and during business hours.  In addition to evidence of [the employer's]
15      actual knowledge, there is considerable evidence that the abusive working
        conditions created by [the executive director] were so pervasive that a jury
16      could infer [the employer] was aware of the way [the executive director] ran
        its business and by permitting such conditions to continue authorized his
17      abusive acts.

18          A third relevant factor is whether "the master has reason to expect
        that such an act will be done."  Restatement § 219(2)(b).  One can hardly be
19      surprised when sexual harassment that has occurred for years continues.  A
        jury might well find that if [the employer] was aware of the work
20      environment [the executive director] created, it should have anticipated
        even the final sexual assaults and rapes with which Heinze is charged in
21      these cases.

22  *Id.* at 257-58, 941 P.2d at 1281-82.  The court also reasoned that the executive director

23  simultaneously served the master by running the office, a task he was explicitly

24  authorized to do, and served his personal desires by fondling the file clerks and offering

25  advancement for sex.  *Id.* at 258, 941 P.2d at 1282.  Moreover, it appeared that the

26  employer did not adopt either a formal policy against sexual harassment or a grievance

27  procedure for employees, presumably leaving sexual harassment complaints to be

28  resolved by the executive director.  The court thus concluded that the record did not

1    establish as a matter of law that the executive director's acts were not within the course

2    and scope or authorization of his employment.

3         In *Higgins*, after the supervisor and plaintiff employee's consensual sexual

4    relationship had terminated, the supervisor attempted to contact the plaintiff at home on a

5    holiday and went to her home when he received no response.  217 Ariz. at 292, 173 P.3d

6    at 456.  He knocked on the door of her apartment, but when no one responded, he entered

7    uninvited and found the plaintiff and her male companion dressed only in bath towels.

8    The supervisor became enraged, attacked plaintiff's companion, and assaulted the

9    plaintiff by throwing her out the front door where her towel came off and she hit a wall.

10   The supervisor then punched the plaintiff and told her she was fired.  *Id.*  The Arizona

11   Court of Appeals affirmed a jury verdict, finding the supervisor's firing of the plaintiff

12   occurred within the course and scope of employment, such that the company was

13   vicariously liable for those acts.  The court found that several factors weighed against that

14   conclusion, *i.e.*, the acts took place outside the office on a holiday weekend, the employer

15   had no reason to expect the acts, and firing the plaintiff appeared to further only the

16   supervisor's interests.  *Id.* at 297, 173 P.3d at 461.  But the court found that there was

17   evidence the supervisor had authority to fire employees, fired the plaintiff, and acted in

18   accordance with that conduct the next day by disconnecting her company cell phone.  The

19   court also considered that no one at the company later acted to counter the supervisor's

20   acts, which further suggested that the employer considered the termination valid and

21   within the scope of the supervisor's employment.  In its communications with the

22   plaintiff, the employer did not repudiate or rescind or attempt to ameliorate any of the

23   supervisor's conduct.  *Id.*  The court therefore concluded that reasonable jurors could

24   have considered the evidence and found that the employer accepted that the termination

25   was in furtherance of its business and within the supervisor's authority.  *Id.* at 297-98,

26   173 P.3d at 461-62.

27        Here, the facts alleged by Plaintiff weigh against concluding that Manford acted

28   within the course and scope of his employment.  Plaintiff does not allege facts to support

1    finding that Manford's actions served or furthered CCA's business purpose.  Plaintiff

2    does not allege facts to support finding that Manford's actions were commonly done by

3    detention officers or were similar to authorized actions.  Plaintiff does not allege facts to

4    support finding that CCA ratified Manford's conduct.  Plaintiff does not allege facts to

5    support finding that CCA had reason to expect that such actions would be done.

6    Although Plaintiff alleges that published reports and studies indicated that transgender

7    women detainees were at risk of sexual abuse, CCA housed Plaintiff in administrative

8    segregation, out of the general population.  Plaintiff's factual allegations support finding

9    that Manford's actions were not only criminal, but a substantial departure from the

10   normal method of performing his job.  Therefore, the Complaint fails to state a claim for

11   battery against CCA.

12          Therefore, Count V will be dismissed as to CCA.

13          Plaintiff will be granted leave to amend her Complaint because leave to amend

14   should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).

15          IT IS THEREFORE ORDERED that Defendant City of Eloy's Motion to Dismiss

16   (Doc. 17); Defendants Corrections Corporation of America, Chuck DeRosa, and T.

17   Mohn's Motion to Dismiss (Doc. 26), joined by Defendant Donal Adams (Doc. 38); and

18   Defendants Katrina S. Kane, Earl Scalet, Bo Campbell, and Michael Leal's Motion to

19   Dismiss (Doc. 43) are granted.

20          IT IS FURTHER ORDERED that Counts I, II, IV, and V of the Complaint against

21   Defendants Corrections Corporation of America, Chuck DeRosa, T. Mohn, Donal

22   Adams, and the City of Eloy are dismissed.

23          IT IS FURTHER ORDERED that Count III of the Complaint against Defendants

24   Katrina S. Kane, Earl Scalet, Bo Campbell, and Michael Leal is dismissed.

25   ...

26   ...

27   ...

28   ...

1    IT IS FURTHER ORDERED that Plaintiff may file an Amended Complaint by

2  July 27, 2012.

3    DATED this 13th day of July, 2012.

4

5    _____

  Neil V. Wake
6    United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28