**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tanya Guzman-Martinez, | No. CV-11-02390-PHX-NVW |
| Plaintiff, | **ORDER** |
| vs. | |
| Corrections Corporation of America, et al., | |
| Defendants. | |

Before the Court are the CCA Defendants' Motion to Dismiss (Doc. 73) by Corrections Corporation of America, Chuck DeRosa, T. Mohn, and Captain Adams (collectively, "CCA Defendants"), joined by Defendant Justin Manford (Doc. 75); the Defendant City of Eloy's Motion to Dismiss (Doc. 74); and the Motion to Dismiss First Amended Complaint (Doc. 78) by Defendants Katrina S. Kane, Robert Campbell, and Michael Leal, employees of the United States Immigration and Customs Enforcement ("ICE").

I.   **BACKGROUND**

On July 13, 2012, motions to dismiss claims against the CCA Defendants, the City of Eloy, and individual defendants were granted with leave to file an amended complaint. ("First Dismissal Order," Doc. 68.)  Defendant Manford did not file a motion to dismiss, and the Court did not decide whether any claims against Manford should be dismissed. On July 27, 2012, Plaintiff filed an Amended Complaint (Doc. 69), which alleges the following claims:

Count I:     Deprivation of Constitutional Rights Under Fifth & Fourteenth Amendments–Due Process (42 U.S.C. § 1983) (Against Manford, City of Eloy, CCA, DeRosa, Mohn, Adams)

Count II:    Deprivation of Constitutional Rights Under the Fifth Amendment–Due Process (*Bivens*) (Against Kane, Campbell, Leal)

Count III:   Cruel, Inhuman, and Degrading Treatment in Violation of 28 U.S.C. § 1350 (Against Manford and CCA)

Count IV:    Battery (Against Manford and CCA)

Count VI:[1]  Intentional Infliction of Emotional Distress (Against Manford and CCA)

Count VII:   Negligent Supervision (Against CCA and DeRosa)

All of the defendants named in the Amended Complaint have filed motions to dismiss. None of the motions seek dismissal of Count IV with respect to Manford or Counts VI and VII.

## II.    LEGAL STANDARD

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), all allegations of material fact are assumed to be true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). To avoid dismissal, a complaint need contain only "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The principle that a court accepts as true all of the allegations in a complaint does not apply to legal conclusions or conclusory factual allegations. *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009). "A claim has facial

---

[1] The Amended Complaint does not include a Count V.

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III.  FACTS ASSUMED TO BE TRUE

The Court assumes the following facts pled by Plaintiff to be true for the purpose of deciding the motions to dismiss.

The Corrections Corporation of America ("CCA") owns and operates the Eloy Detention Center ("Center") in Eloy, Arizona, under a contract with the City of Eloy, which has a contract with the United States Immigration and Customs Enforcement ("ICE") to house ICE detainees.  On February 17, 2006, ICE executed an agreement that the City had signed on February 13, 2006, for the detention and care of ICE detainees. The agreement requires the City to house detainees in accordance with the most current editions of the ICE Detention Requirements, American Correctional Association Standards for Adult Local Detention Facilities, and National Commission on Correctional Health Care standards.  It provides that ICE inspectors will conduct periodic inspections of the facility to assure compliance with the identified standards.  It also provides that ICE will pay the City $68.45 per day per detainee accepted and housed by the City.

Also on February 17, 2006, CCA executed an agreement that the City had signed on February 14, 2006.  It provides that CCA will provide services in compliance with the terms of the agreement between the City and ICE for every federal inmate accepted into custody at the Center and the City will pay CCA the per diem fee paid to the City by ICE. In return, CCA will pay the City an administrative fee of $.25 per day per inmate held at the Center pursuant to the two agreements.  The agreement between the City and CCA also provides that CCA will indemnify the City and its officers and employees from liability and any claims to the extent they arise as a result of CCA's acts and omissions in the performance of the agreement.

The ICE Detention Standard requires that detainees be screened for potential vulnerabilities upon arrival at a detention facility and that each detainee's classification

be reviewed at regular intervals or at any other time when additional relevant information, such as an assault or victimization, becomes known. The American Correctional Association Standards require that single occupancy cells be available when indicated for inmates likely to be exploited or victimized by others. The National Commission on Correctional Health Care has declared that custody staff should be aware that transgender people are common targets for violence and should take appropriate safety measures regardless of whether the individual is placed in male or female housing areas.

In September 2009, Plaintiff was placed in federal immigration removal proceedings and detained from September 29, 2009, until May 14, 2010, at the Center. She applied for asylum, withholding of removal, and protection under the Convention Against Torture because of past persecution and fear of future persecution in Mexico because of her gender identity. Her application for withholding of removal was granted by the Eloy Immigration Court on March 1, 2010.

Plaintiff Tanya Guzman-Martinez describes herself as a transgender woman, who was born biologically male, but self-identifies as female.[2] She has undergone surgical alterations to her breasts, buttocks, hips, and legs to appear more feminine and, at the time she was detained, was taking hormones and estrogen to prepare for gender reassignment surgery. She does not claim to be biologically female presently.

Immediately after arriving at the Center, Plaintiff told officials that she wished to be placed in protective custody because she feared for her safety because of her transgender identity. Following her classification at intake, she was placed in North Special Housing Unit, an administrative housing unit including protective custody for a range of specially classified detainees.

---

[2] This Order uses the term "transgender woman" to identify a person who is biologically male and self-identifies as female.

Throughout her detention at the Center, Plaintiff was housed in a male special housing unit (*i.e.*, administrative segregation) where she was in daily, direct contact with male detainees and detention officers.  She was subjected to repeated verbal abuse and harassment by male detainees and male detention officers.  She was threatened with disciplinary action.  Plaintiff often was patted-down by male detention officers, but after complaining to the Center staff, she was told she would no longer be subjected to pat-downs by male detention staff.

On December 7, 2009, Defendant Justin Manford, a detention officer at the Center employed by CCA, while on duty and in uniform, forced Plaintiff to watch him masturbate into a styrofoam cup and then demanded that she ingest his ejaculated semen.  Manford threatened that he could have Plaintiff locked up in "the hole," lengthen her detention, or have her deported to Mexico if she did not comply with his demands.  The incident followed a history of Manford questioning Plaintiff regarding her sexuality, whether she had a boyfriend, and whether other inmates had seen her breasts.  Plaintiff immediately reported the incident to CCA detention staff, ICE, and the Eloy Police Department.  On June 8, 2010, Manford was convicted in the Pinal County Superior Court for Attempted Unlawful Sexual Contact in violation of A.R.S. § 13-1419(A)(2).

On April 23, 2010, a male detainee, Johnny Pereira Vigil pushed Plaintiff, grabbed her breast, and slapped her on her buttocks.  When Plaintiff told Vigil to stop, Vigil threatened that he or other detainees would physically hurt her.  This incident followed a period of Vigil harassing Plaintiff by calling her a "faggot," making sexual gestures, following her in and out of her cell, and peeking into her cell when Plaintiff was using the toilet or dressing.  Because she was afraid of retaliation, Plaintiff did not report it to CCA detention staff until April 30, 2010.  The Eloy police were called to the Center on May 4, 2010, and completed an incident report.  On the same day, Plaintiff was moved from North Special Housing Unit to medical isolation where she was placed in a single cell.  She remained in medical isolation until her release on approximately May 15, 2010.

After the incidents, Plaintiff experienced severe depression and anxiety and required medication for anxiety and as a sleep aid.  She has experienced episodes of hyper-vigilance from fear of retaliation by officers or detainees.  Since her release from custody, Plaintiff continues to suffer from depression, anxiety, and fear of contact with law enforcement.  It is possible that Plaintiff could be detained by ICE/CCA in the future because withholding of removal does not permit adjustment status to legal permanent resident or naturalization to U.S. citizen.

Defendant Chuck DeRosa was an employee of CCA and the Center's warden, responsible for setting its operational policies and implementing and approving its practices for housing transgender detainees.  Defendant T. Mohn was the unit manager at the Center and responsible for determining Plaintiff's classification status.  Defendant Captain Adams was a detention officer at the Center and responsible for overseeing decisions about Plaintiff's housing and classification status.

Defendant Katrina Kane was the ICE Field Office Director in Phoenix, which includes the Center.  Defendant Bo Campbell was the ICE Supervisory Detention and Deportation Officer at the Center.  Defendant Michael Leal was the ICE Deportation Officer responsible for matters relating to Plaintiff's detention and removal proceedings including issues regarding her custody and classification.

On December 5, 2011, Plaintiff initiated this lawsuit.  She seeks money damages, punitive damages, and declaratory judgment that "the policies and practices concerning the housing and treatment of transgendered detainees in [the Center] are inadequate, and unlawfully and unreasonably expose detainees to harm."

## IV.   ANALYSIS

### A.   Claim Against Federal Defendants Katrina S. Kane, Bo Campbell, and Michael Leal

Count II is the only claim pled against ICE employees Kate, Campbell, and Leal. The Amended Complaint identifies it as a *Bivens* claim, which therefore the Court construes as seeking only money damages against these defendants.

Kane, Campbell, and Leal contend that qualified immunity bars Count II. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, __ U.S. __, 131 S. Ct. 2074, 2080 (2011). Courts have discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first and may grant qualified immunity on the basis of the second prong alone without deciding the first prong. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *James v. Rowlands*, 606 F.3d 646, 651 (9th Cir. 2010).

### 1. The Constitutional Standard for Classifying, Housing, and Supervising Transgender Women Was Not Clearly Established.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. at 2083 (internal quotation and alteration marks omitted). For a right to be "clearly established," there need not be a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson*, 555 U.S. at 244.

Relying on *Farmer v. Brennan*, 511 U.S. 825 (1994), Plaintiff contends that "it is a violation of the United States Constitution for federal officials to confine persons while disregarding a substantial risk of serious harm to their health and safety." As a detained alien, Plaintiff has a constitutional right that officials not consciously disregard or act with deliberate indifference toward her safety by knowingly placing her in harm's way. *Papa v. United States*, 281 F.3d 1004, 1010 (9th Cir. 2002). Plaintiff contends her constitutional right that detention officials not act with deliberate indifference to a

substantial risk of serious harm was clearly established.  That may be true, but to hold detention officials liable for violating a constitutional right, "the contours of [the] right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. at 2083.

In the First Dismissal Order, the Court found that the Complaint failed to allege what the constitutional standard is for housing detainees who are transgender women or any consensus regarding classification, housing, training, and supervision policies and practices to protect transgender women detainees.  (Doc. 68 at 13.)  The Amended Complaint alleges specific recommendations included in the 2011 ICE Performance-Based National Detention Standards and the 2012 Prison Rape Elimination Act National Standards, but those were not adopted until after Plaintiff's period of detention and therefore do not represent standards that were clearly established at the time of the alleged constitutional violation.  Moreover, Plaintiff expressly does not allege that any of the specific recommendations are constitutionally required.  The Amended Complaint alleges:

> Plaintiff is not claiming that any one particular procedure or practice is constitutionally required.  Rather, she asserts that the Defendants' failure to institute any protective practices, despite the known vulnerability of transgender female detainees and despite actual knowledge of Plaintiff's vulnerability and prior abuse, constitutes deliberate indifference.

(Doc. 69 at ¶ 6.)  Plaintiff also states she is not "asserting a clearly established right to female-only supervision and/or housing for transgender women detainees."  (Doc. 82 at 7.)

The Amended Complaint alleges that following Plaintiff's classification at intake, she was placed in a special housing unit that included protective custody.  This fact alone contradicts her allegation that Defendants failed "to institute any protective practices."  Further, the Amended Complaint alleges that she remained in protective custody or

- 8 -

administrative segregation until she was moved to a single cell on May 4, 2010, after detainee Vigil pushed, grabbed, and slapped her.  But the Amended Complaint does not allege what more was constitutionally required.

Therefore, the Amended Complaint fails to allege that Defendants Kane, Campbell, or Leal violated a clearly established constitutional right for which, at the time of the challenged conduct, the contours of the right were sufficiently clear that every reasonable official would have understood that what he is doing violates that right.

### 2.     Plaintiff Has Not Alleged that Each ICE Defendant Violated the Constitution Through His or Her Own Individual Actions.

To establish liability under 42 U.S.C. § 1983, a plaintiff must plead that each government official defendant has violated the Constitution through the official's own individual actions.  *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012).  Count II alleges that Kane, Campbell, and Leal "exhibited deliberate indifference in their respective capacities by (1) willfully disregarding the necessity of policies and measures to prevent assault, sexual assault, and abuse of transgender detainees under ICE custody in the [Center]; and (2) failing to appropriately monitor and supervise housing and detention conditions which they knew were proceeding in violation of applicable contracts, policies, and standards designed to prevent assault, sexual assault, and abuse of transgender detainees, including Ms. Guzman-Martinez."

The Amended Complaint alleges the following individual actions by Kane, Campbell, or Leal:

> Campbell had a duty and failed to act to protect Ms. Guzman-Martinez from ongoing harm by safely housing her in a manner that protected her bodily integrity and complied with applicable standards.  (Doc. 69 at ¶ 25.)

> Defendant Leal . . . failed to act to protect Ms. Guzman-Martinez from ongoing harm by safely housing her in accordance with applicable standards.  (*Id.* at ¶ 26.)

- 9 -

Defendants . . . Campbell and Leal's failures to conduct an adequate risk assessment about the placement and classification of Ms. Guzman-Martinez at [the Center], and to properly and safely supervise . . ., and to protect her before and even after she was assaulted the first time, enabled these assaults and made her extremely fearful and vulnerable to further harm.  (*Id.* at ¶ 90.)

As a result of Defendants . . . Kane, Campbell, . . . []'s failure to adopt procedures to protect transgender female detainees from harassment and sexual abuse and their failure to institute appropriate screening, education, training, monitoring and supervision, Ms. Guzman-Martinez experienced harassment, sexual assault, great fear and significant emotional distress while she was detained.  (*Id.* at ¶ 92.)

Defendants . . . Kane, Campbell . . . failed to implement the contractually required standards including the ICE Detention Standards, the American Correctional Association (ACA) Standards for Adult Local Detentional Facilities and the National Commission on Correctional Health Care (NCCHC), to protect the welfare of vulnerable detainees, such as Ms. Guzman-Martinez at [the Center].  (*Id.* at ¶ 99.)

Defendants . . . Campbell and Leal were deliberately indifferent by not following any of these [ICE, ACA, NCCHC] standards upon initial booking at [the Center] and after Ms. Guzman-Martinez was assaulted for the first time. (*Id.* at ¶ 108.)

Thus, the Amended Complaint alleges only that Campbell and Leal failed to conduct an adequate risk assessment at intake and to place Plaintiff in safe housing and that Kane and Campbell failed to adopt procedures and implement certain standards that were not constitutionally required.

Other allegations refer to failures by "ICE and CCA Defendants," "ICE Defendants," or "individual ICE Defendants," but do not allege any actions or omissions by Kane, Campbell, or Leal specifically.  For example, the Amended Complaint alleges:

Throughout her detention at [the Center], Ms. Guzman-Martinez was housed in a male "special housing unit" or

"SHU" where the established or professionally recommended procedures for keeping transgender female detainees safe were not in place, and where the officers who supervised her had inadequate monitoring, supervision, education and training, even after knowing that she had been sexually assaulted. The decisions by Defendants CCA, DeRosa, Mohn, Adams, Manford and the individual ICE Defendants to allow her to be housed in this manner enabled the abusive and assaultive actions against Ms. Guzman-Martinez.

(*Id.* at ¶ 55.)

Although the Amended Complaint alleges that Campbell and Leal failed to conduct an adequate risk assessment at intake and to place Plaintiff in safe housing, it also alleges that Plaintiff was assessed at intake and placed in protective custody. Although the Amended Complaint alleges that Kane and Campbell failed to adopt procedures and implement certain standards, those procedures and standards were not constitutionally required. Moreover, the Amended Complaint does not allege that had Kane and Campbell done so, the Manford and Vigil incidents likely would have been prevented.[3]

Therefore, Count II against Kane, Campbell, and Leal is barred by qualified immunity.

### B. Claim Against the City of Eloy

Count I is the only claim pled against the City of Eloy. "To bring a § 1983 claim against a local government entity, a plaintiff must plead that a municipality's policy or custom caused a violation of the plaintiff's constitutional rights." *Ass'n for Los Angeles Deputy Sheriffs v. Cnty. of Los Angeles*, 648 F.3d 986, 992-93 (9th Cir. 2011). A plaintiff must show (1) he possessed a constitutional right of which he was deprived, (2) the municipality had a policy, (3) the policy amounts to deliberate indifference to the

---

[3] Although the Amended Complaint alleges repeated verbal abuse and harassment, the alleged verbal abuse and harassment does not rise to the level of a substantial risk of serious harm to Plaintiff's health and safety.

plaintiff's constitutional right, and (4) the policy is the "moving force behind the constitutional violation." *Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006). "For a policy to be the moving force behind the deprivation of a constitutional right, the identified deficiency in the policy must be closely related to the ultimate injury," and the plaintiff must establish "that the injury would have been avoided had proper policies been implemented." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1190 (9th Cir. 2006).

In dismissing the Complaint, the Court found:

> Plaintiff does not allege any specific custom or policy of the City that allegedly amounted to deliberate indifference to Plaintiff's constitutional rights. Plaintiff does not allege that the City was deliberately indifferent by delegating its responsibility to CCA generally or by failing to impose certain requirements on CCA. The Complaint alleges only that the City maintained policies, practices, and/or customs of failing to prevent assault, sexual assault, and abuse and failing to appropriate monitor and supervise detention conditions.

> Further, the City's custom or policy of failing to implement unspecified policies and practices is not closely related to the ultimate injury, notwithstanding the Complaint's conclusory allegations of direct and proximate causation. The Court does not assume as true the Complaint's legal conclusions and conclusory factual allegations that the City's failure to adopt and implement unspecified policies directly and proximately caused Plaintiff's injuries. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The agreement between ICE and the City requires the City to house immigration detainees in accordance with certain standards, which Plaintiff does not allege require the City to house transgender women in single-occupancy cells or women's facilities or to keep them away from contact with male detention officers. At most, the Complaint alleges that NCCHC recommends that custody staff be aware that transgender people are common targets for violence and appropriate safety measures should be taken and that the ACA Standards provide that single-occupancy cells should be available for inmates likely to be exploited or victimized. The Complaint does not allege that if custody staff had been

provided awareness training or if Plaintiff had been provided a single-occupancy cell, neither detention officer Manford nor detainee Vigil would have subjected Plaintiff to the December 7, 2009 and April 23, 2010 incidents from which Plaintiff's claims of deprivation of constitutional rights arise. Causation is even more attenuated because even if the City were to adopt certain unidentified policies, they could only be implemented by CCA. Thus, the City's failure to adopt policies regarding housing and protecting transgender women immigration detainees is not the "moving force" behind the December 7, 2009 and April 23, 2010 incidents from which Plaintiff's claims of deprivation of constitutional rights arise.

(Doc. 68 at 17-18.) Because the Amended Complaint does not include any amended allegations regarding the City, the foregoing analysis continues to apply.

Further, Plaintiff's response to the City's motion to dismiss states that her injuries resulted from being housed with a male population: "At the Eloy Detention Center, despite her female appearance, Plaintiff was housed with the male population and, as a result, suffered regular harassment and threats and fell victim to multiple sexual assaults." (Doc. 80 at 2.) Yet the Amended Complaint expressly disclaims that a different housing policy or practice is constitutionally required (Doc. 69 at ¶ 6), and Plaintiff affirmatively states that she is not asserting a right to female-only supervision and/or housing for transgender women detainees (Doc. 82 at 7).

The City's contention that acting under federal authority eliminated its character as a state actor is no more persuasive than in its previous motion to dismiss, and the Court does not dismiss Count I of the Amended Complaint on that ground.

Therefore, for the reasons stated in the First Dismissal Order (Doc. 68), Count I fails to state a claim upon which relief can be granted against the City.

## C.    Claims Against CCA, DeRosa, Mohn, and Adams

### 1.    Count I (§ 1983) (Constitutional Rights)

To plead a claim under § 1983 against CCA, DeRosa, Mohn, and Adams, Plaintiff "must allege the violation of a right secured by the Constitution and laws of the United

States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Further, because *Monell v. Dep't of Soc. Servs.*, 36 U.S. 658, 691 (1978), applies to suits against private entities under § 1983, to state a claim against CCA, Plaintiff must allege not only that CCA was acting under color of state law, but also that the constitutional violation was caused by an official policy or custom of CCA. *Tsao v. Desert Palace, Inc.*, __ F.3d __, 2012 WL 5200336 at *7 (9th Cir. Oct. 23, 2012). CCA cannot be held liable under § 1983 solely because it employed a tortfeasor. *Id.* at *6.

> a. **Plaintiff Has Not Alleged a Violation of a Constitutional Right.**

The Amended Complaint does not allege that Plaintiff's constitutional rights were violated by an official policy or custom of CCA. It alleges that CCA and DeRosa failed to implement policies and practices to prevent assault, sexual assault, and abuse by detainees and guards and failed to appropriately monitor and supervise detention conditions. It further alleges that the "individual CCA Defendants failed to institute appropriate standards addressing the treatment and care of transgender immigrant detainees and failed to adequately screen, train, supervise, and monitor CCA officers in charge of vulnerable detainees including Defendant Manford." It also alleges that Mohn and Adams failed to adequately evaluate the risk to Plaintiff as a transgender woman detainee and that they failed to properly classify and place Plaintiff in safe housing with adequate supervision. But Plaintiff was classified at intake and was placed in a special housing unit; she was moved to a single occupancy cell after she reported the Vigil incident. The Amended Complaint does not allege, even generally, what classification and housing she should have received instead or what policies CCA should have adopted to avoid the risk of either the Manford incident or the Vigil incident. Plaintiff does not contend that she had a constitutional right to female-only supervision and/or housing for transgender women detainees. In fact, the Amended Complaint affirmatively disclaims that any one particular procedure or practice is constitutionally required.

- 14 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Instead, the Amended Complaint alleges, referring to all Defendants collectively, that "Defendants should have taken steps to protect Plaintiff from harm," such as practices now identified in the Prison Rape Elimination Act National Standards, 28 C.F.R. 115 (2012). The Amended Complaint further alleges that Defendants could have provided enhanced monitoring of contact Plaintiff had with males in the special housing unit, provided her "solitary housing, placed her with similarly situated vulnerable detainees, or placed her in a female facility (whether in her own cell or with other detainees)," but "Plaintiff is not asserting that any one of these is constitutionally required." (Doc. 69 at ¶ 111.) Therefore, DeRosa, Mohn, and Adams cannot have been deliberately indifferent to Plaintiff's constitutional rights if they did not know what was required beyond placing her in a special housing unit. Moreover, CCA could not have had an official policy or custom of refusing to adopt a policy or custom when it was unclear what policy or custom was constitutionally—or practically—required to protect Plaintiff from the Manford and Vigil incidents.

The Amended Complaint does not allege that either the Manford incident or the Vigil incident would have been avoided had different policies been implemented. It does not allege that a constitutional violation was caused by an official policy or custom of CCA and does not allege facts to support its legal conclusion that Plaintiff's injuries were caused by all Defendants' "failure to implement reasonable procedures and follow the law and governing standards." Therefore, the Amended Complaint does not allege facts showing that CCA, DeRosa, Mohn, or Adams violated a right secured by the Constitution and laws of the United States.

**b.      CCA, DeRosa, Mohn, and Adams Were Not Acting Under Color of State Law.[4]**

To plead a claim under § 1983 against CCA, DeRosa, Mohn, and Adams, Plaintiff must allege that these Defendants deprived her of constitutional rights while acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia."  42 U.S.C. § 1983.  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *West*, 487 U.S. at 49 (internal quotation marks and citation omitted).  "To constitute state action, the deprivation must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the State is responsible."  *Id.*

"Whether a private party engaged in state action is a highly factual question. . . . Only by sifting facts and weighing circumstances can we hope to ferret out obvious as well as non-obvious State involvement in private conduct."  *Brunette v. Humane Soc'y of Ventura Cnty.*, 294 F.3d 1205, 1209 (9th Cir. 2002) (internal quotation marks and citation omitted).  The inquiry must begin by identifying the function at issue, *i.e.*, the specific conduct of which the plaintiff complains, because an entity may be a state actor for some purposes, but not for others.  *Caviness v. Horizon Cmty. Learning Ctr.*, 590 F.3d 806, 812-13 (9th Cir. 2010).

The criteria for determining what constitutes state action "lack rigid simplicity." *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003).  No specific set of circumstances is absolutely sufficient because there may be some countervailing reason against attributing the action to the government.  *Id.*  At least four different tests are recognized: (1) public function, (2) joint action, (3) compulsion, and (4) nexus.  *Id.*  Any one of the

---

[4] The First Dismissal Order declined to decide whether CCA, DeRosa, Mohn, and Adams acted under color of state law as an alternate ground for dismissal.  (Doc. 68 at 18.)

four tests is sufficient to find state action as long as no countervailing factor exists. *Id.* However, the central question is whether the alleged violation of constitutional rights is fairly attributable to state government. *Id.* at 1096.

### (i) Public Function

Plaintiff contends that the public function test is satisfied. "Under the public function test, when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Kirtley*, 326 F.3d at 1093. The theoretical underpinnings of the public function test have been summarized as follows:

> The theory is that if the government must satisfy certain constitutional obligations when carrying out its functions, it cannot avoid those obligations and deprive individuals of their constitutionally protected rights by delegating governmental functions to the private sector. The delegation of the function should be accompanied with a delegation of constitutional responsibilities.

*Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 826 (7th Cir. 2009) (quoting Martin A. Schwartz, 1 Section 1983 Litigation Claims and Defenses § 5.14 [A] at 5-100 (4th ed. 2003)).

"The public function test is satisfied only on a showing that the function at issue is both traditionally and exclusively governmental." *Kirtley*, 326 F.3d at 1093. "[T]he relevant question is not simply whether a private group is serving a 'public function,'" but "whether the function performed has been 'traditionally the *exclusive* prerogative of the State.'" *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982); *see also Brunette*, 294 F.3d at 1210 ("[T]he 'public functions' test inquires whether the private actor performs functions traditionally and exclusively reserved to the States."); *Vincent v. Trend Western Technical Corp.*, 828 F.2d 563, 569 (9th Cir. 1987) (repair and maintenance of military aircraft or facilities was a traditional function of government, but not one of the government's "exclusive prerogatives"); *Dobyns v. E-Systems, Inc.*, 667 F.2d 1219, 1225-

26 (5th Cir. 1982) (the United States delegated to a private contractor a broad governmental role that included a peacekeeping function, which was traditionally exclusively reserved to the government).

It is undisputed that CCA operates the Center under a contract with the City, which transfers to CCA the City's obligations and benefits obtained through a contract with ICE.  It also is undisputed that operating a prison traditionally is a governmental function and private operators of a state prison generally are considered as acting under color of state law.  *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 71 n.5 (2001) (*Bivens* remedy was not extended to state prisoners housed in private correctional facility because they already had a right of action against private correctional providers under § 1983); *Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 459, 461 (5th Cir. 2003) ("private prison-management companies and their employees are subject to § 1983 liability because they are performing a government function traditionally reserved to the state"); *Street v. Corr. Corp. of America*, 102 F.3d 810, 814 (6th Cir. 1996) ("[D]efendants were 'acting under color of state law' in that they were performing the 'traditional state function' of operating a prison.").  However, it is disputed whether CCA and its employees "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *West*, 487 U.S. at 49. Whether the CCA operates the immigration detention center under color of state law or under color of federal law is determinative because, "by its very terms, § 1983 precludes liability in federal government actors."  *Morse v. N. Coast Opportunities, Inc.*, 118 F.3d 1338, 1343 (9th Cir. 1997) (§ 1983 was completely barred where no state action was implicated).

The CCA Defendants contend they were not state actors because Plaintiff was in ICE custody at the time of the alleged incidents, detention of aliens is exclusively within federal authority, and CCA's authority derived from the federal government.  Plaintiff

contends that "CCA Defendants are state actors by virtue of CCA's contractual relationship with [the City of] Eloy."

The specific conduct complained of is: (1) CCA's and DeRosa's failure to implement policies and practices to prevent assault, sexual assault, and abuse of transgender immigrant detainees by detainees and guards and failure to appropriately monitor and supervise detention conditions of transgender immigrant detainees and (2) Mohn's and Adams' failure to adequately evaluate the risk to Plaintiff as a transgender woman detainee and failure to properly classify and place Plaintiff in safe housing with adequate supervision. Even if the specific conduct complained of deprived Plaintiff of a constitutional right, Plaintiff was detained at the Center by ICE under federal law, not by the City under state law. Adopting policies and practices regarding ICE detention of immigrants is "both traditionally and exclusively governmental," *see Kirtley*, 326 F.3d at 1093, but it is traditionally the "exclusive prerogative" of federal government, not state government. *See Rendell-Baker*, 457 U.S. at 842. CCA's authority and obligation to adopt policies and practices regarding the classification, housing, monitoring, and supervision of transgender immigrant detainees, if any, is delegated by ICE through contracts with the City. Thus, the public function test is not met under the circumstances alleged here.

### (ii)    Joint Action

Under the joint action test, courts consider whether the state has knowingly accepted benefits derived from unconstitutional conduct, thereby becoming interdependent with the private entity and a joint participant in the challenged activity. *Kirtley*, 326 F.3d at 1093. Without more, governmental funding and extensive regulation do not establish governmental involvement in the actions of a private entity. *Morse*, 118 F.3d at 1341. To be liable under the joint action test, not only must the private party be a willful participant with the State or its agents in an activity that deprives a plaintiff of her

constitutional rights, but also the private party's actions must be "inextricably intertwined" with those of government.  *Brunette*, 294 F.3d at 1211.

Here, the Amended Complaint does not allege that the state or the City have knowingly accepted benefits derived from unconstitutional conduct or that the City and CCA or its employees acted jointly in the challenged activity.  Even if the contract between the City and CCA imposed extensive regulation and provided governmental funding, it would be insufficient to establish joint action.  The contract merely acted as a conduit for transferring regulation and funding from ICE to CCA.

### (iii)    Compulsion

Under the compulsion test, courts consider whether the coercive influence of the state effectively converts a private action into a state action.  *Kirtley*, 326 F.3d at 1094.  The Amended Complaint does not allege that the state or the City coerced CCA or its employees to take any action.

### (iv)    Nexus

Under the nexus test, courts consider whether there is such a close nexus between the state and the challenged action that the action may be fairly treated as that of the state itself.  *Kirtley*, 326 F.3d at 1095.  The Amended Complaint does not allege that the challenged action may be fairly treated as that of the state or the City itself.

### (v)    Countervailing Factors

A countervailing factor is "some value at odds with finding public accountability in the circumstances."  *Kirtley*, 326 F.3d at 1095 (quoting *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 303 (2001)).  Because none of the tests favor finding CCA, DeRosa, Mohn, or Adams acted under color of state law, it is not necessary to examine any countervailing factors.

The Amended Complaint does not allege facts sufficient to demonstrate that CCA, DeRosa, Mohn, or Adams deprived Plaintiff of a constitutional right while acting under color of state law.  Therefore, Count I fails to state a claim upon which relief can be granted against CCA, DeRosa, Mohn, or Adams.

### 2.      Count III (§ 1350) (Alien Tort Claim Act)

For the reasons stated in the First Dismissal Order (Doc. 68 at 18-21), the Amended Complaint fails to state a claim upon which relief can be granted under the Alien Tort Claim Act, 28 U.S.C. § 1350, against CCA.

### 3.      Count IV (Battery)

For the reasons stated in the First Dismissal Order (Doc. 68 at 22-26), the Amended Complaint fails to state a claim upon which relief can be granted for battery against CCA.

### D.      Claims Against Manford

### 1.      Count I (§ 1983) (Constitutional Rights)

To plead a claim under § 1983 against Manford, Plaintiff must allege that he deprived her of constitutional rights while acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia."  42 U.S.C. § 1983.  As found above, CCA and its employees were not acting under color of state law when allegedly violating Plaintiff's constitutional rights.  The same analysis applies to Manford.  Therefore, Count I of the Amended Complaint fails to state a claim against Manford upon which relief can be granted.

### 2.      Count III (§ 1350) (Alien Tort Claim Act)

For the reasons stated in the First Dismissal Order (Doc. 68 at 18-21) regarding Plaintiff's claim under the Alien Tort Claim Act, 28 U.S.C. § 1350, against CCA, DeRosa, Mohn, and Adams, Count III of the Amended Complaint fails to state a claim against Manford upon which relief can be granted.

### 3.      Count IV (Battery)

Manford has not moved to dismiss Count IV, battery, or Count VI, intentional infliction of emotional distress.

## V.      COUNTS I, II, III, AND IV WILL BE DISMISSED WITH PREJUDICE.

Although leave to amend should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), the Court has "especially broad" discretion to deny leave to amend

where the plaintiff already has had one or more opportunities to amend a complaint. *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1161 (9th Cir. 1989). "Leave to amend need not be given if a complaint, as amended, is subject to dismissal." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 538 (9th Cir. 1989). "Futility of amendment can, by itself, justify the denial of a motion for leave to amend." *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).

Plaintiff already has had an opportunity to amend her complaint. Because further amendment would be futile, Counts I, II, and III against all Defendants and Count IV against CCA only will be dismissed without leave to amend.

IT IS THEREFORE ORDERED that the CCA Defendants' Motion to Dismiss (Doc. 73) by Corrections Corporation of America, Chuck DeRosa, T. Mohn, and Captain Adams, joined by Defendant Justin Manford (Doc. 75), is granted, except that it is denied as to Defendant Justin Manford on Count IV (battery).

IT IS FURTHER ORDERED the Defendant City of Eloy's Motion to Dismiss (Doc. 74) and the Motion to Dismiss First Amended Complaint (Doc. 78) by Defendants Katrina S. Kane, Robert Campbell, and Michael Leal are granted.

IT IS FURTHER ORDERED that Counts I, II, and III of the Amended Complaint are dismissed with prejudice for failure to state a claim upon which relief can be granted.

IT IS FURTHER ORDERED that Count IV of the Amended Complaint is dismissed with prejudice for failure to state a claim upon which relief can be granted only with respect to Defendant Corrections Corporation of America. Count IV is not dismissed with respect to Defendant Justin Manford.

Dated this 26th day of November, 2012.

Neil V. Wake
United States District Judge